IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

INDIANA PAIN AND SPINE CLINIC,          )
LLC, and AMIR KAZI, M.D.,                )
                                         )
               Plaintiffs,               )
                                         )
        v.                               )          1:21CV543
                                         )
CAROLINA LIQUID CHEMISTRIES              )
CORPORATION, MR. PHIL SHUGART,           )
and MRS. PATRICIA SHUGART,               )
                                         )
               Defendants.               )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amir Kazi, M.D. agreed to pay the State of Indiana $424,874.64 in

restitution and penalties owed from alleged Medicaid overpayments for urine

drug screen confirmation tests. (Compl. ¶¶ 28, 33; Compl. Ex. 6 at 1, 3 (Settlement

Agreement) [Doc. #1].)  He and his practice Indiana Pain and Spine Clinic, LLC are

now suing Defendants for their alleged part in Dr. Kazi's overpayment liability.

The matter is before the Court on Defendants' Motion to Dismiss [Doc. #13] all

claims against them.  For the reasons that follow, the motion is granted.

I.

For purposes of this motion, the facts are construed in the light most

favorable to Plaintiffs and all reasonable inferences are drawn in their favor. U.S.

ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir.

2014).  Dr. Kazi, a specialist in spine and pain management, resides and practices

medicine in Indiana where he owns and operates Indiana Pain and Spine Clinic. (Compl. ¶¶ 6, 7.) Defendants Phil and Patricia Shugart are the president and vice president, respectively, of Defendant Carolina Liquid Chemistries Corporation ("CLC"), a North Carolina company that manufactures, distributes, resells, and services in-office Urine Drug Testing ("UDT") machines and reagents. (Id. ¶¶ 8-10, 12.)

Dr. Kazi had a UDT system at his office, but it was a "qualitative" system that "only identified the presence of alcohol or drugs but did not test for amounts or types." (Id. ¶ 14.) The Shugarts and CLC marketed their UDT machines as being "capable of performing high complexity 'quantitative' drug testing, for which Medicare and Medicaid can be billed significant amounts." (Id. ¶ 13; see also id. ¶ 25.) For example, Dr. Kazi was usually reimbursed approximately $20 per qualitative test, but a quantitative test could be reimbursed at approximately $467. (Id. ¶ 18.) In addition, quantitative tests "identify which drugs are present in the urine" so Dr. Kazi could "better help his patients with recovery." (Id. ¶ 20.)

In January 2010, to induce physicians to purchase its device and other tools, CLC issued a press release stating that its BioLis 24i UDT device could perform in-office qualitative and quantitative tests. (Id. ¶ 21; Compl. Ex. 2 (Press Release).) In 2013, CLC published and distributed a brochure on its devices, including the BioLis 24i, showing profitability based on Medicare reimbursement and sample test results identifying the presence of specific drugs. (Compl. ¶¶ 22, 23; Compl. Ex. 3 (Urine Drug Testing 2013 Brochure).) The brochure also included

an August 29, 2012 letter by Patricia Shugart advising that the BioLis 24i "is considered a high complexity test system under the Centers for Medicare & Medicaid Services ('CMS') regulations . . . ." (Compl. ¶ 24; Compl Ex. 3 at 22.)

In 2013, Joe Pratt, a CLC salesperson, visited Dr. Kazi, "pitch[ed]" that the CLC urinalysis device was approved by the FDA for quantitative analysis, and showed Dr. Kazi a template of revenue he could generate were he to purchase and use a CLC machine. (Id. ¶ 15.)  On January 9, 2014, Bob Dupor, another CLC salesperson, sold Dr. Kazi a refurbished BioLis 24i and again told Dr. Kazi that the system performed quantitative testing that could be charged to Medicare and Medicaid at a much higher rate than his qualitative tests. (Id. ¶¶ 16-19.)  Several months later in March, Dupor and another CLC employee, Patti Gaul, connected Dr. Kazi with a billing consultant at Provider Business Partners who "directed Dr. Kazi on the way to bill Medicare and Medicaid for the tests." (Id. ¶ 26.)  Dr. Kazi performed the tests, billed as instructed, and received payment, having relied on CLC's marketing and warranty that the BioLis 24i could perform quantitative testing. (Id. ¶ 27.)

On October 24, 2017, Dr. Kazi received a notice from the Indiana Attorney General, Medicaid Fraud Unit ("MFU") alleging that the Indiana Medicaid program had overpaid him $338,460.83 for drug screening tests between January 1, 2014 and December 31, 2016. (Id. ¶¶ 28, 29.)  Dr. Kazi had allegedly up-coded UDT tests by charging for quantitative tests when the UDT equipment was not capable of performing such tests. (Id. ¶ 28; see also id. ¶ 30 ("[T]he Biolis 24i is unable to

3

conduct quantitative testing or multi-assay; it is only capable of single-assay or qualitative testing.").) Specifically, over two-thirds of the overpayment was for "fee for service traditional Medicaid claims for quantitative, confirmation testing done with a 'UDS immunoassay machine manufactured by Carolina Liquid Laboratories in 2015 [that] cannot perform and was never approved by the FDA to perform quantitative, confirmation testing.'" (Id. ¶ 30.) The remainder of the overpayment resulted from inappropriate billing codes. (Id. ¶ 31.) In total, MFU sought $696,411.16 in repayment. (Id.) On September 27, 2018, Dr. Kazi entered into a settlement with the State of Indiana and agreed to pay $424,874.64 in restitution and penalties over three years in monthly installments. (Id. ¶ 33; Compl. Ex. 6 at 3.) Earlier that year, states and government agencies sued CLC for inducing health care providers to submit false claims. (Compl. ¶ 35.)

Dr. Kazi and Indiana Pain and Spine Clinic are suing Defendants for implied-in-law indemnification (Claim I), false advertising (Claim II), breach of implied warranty of merchantability (Claim III), breach of implied warranty of fitness for a particular purpose (Claim IV), and unfair and deceptive trade practices (Claim V).[1] Defendants contend that the statutes of limitations bar all five claims and that Plaintiffs have otherwise failed to state a claim for which relief can be granted.

---

[1] Although Plaintiffs' tort claims are intentional torts, they allege in one paragraph of the Complaint that Dr. Kazi's "overpayment liability is clearly the result of the actions [sic] Defendants' negligent actions", (Compl. ¶ 34).

4

II.

To survive a motion to dismiss made pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556); <u>see also</u> <u>McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.</u>, 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is <u>plausible</u> on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557).

When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. <u>U.S. ex rel. Oberg</u>, 745 F.3d at 136. Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. <u>Twombly</u>, 550 U.S. at 557. In other words,

5

"[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555. In addition to factual allegations, the court "consider[s] documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted).

Furthermore, a defendant may raise the statute of limitations bar, which is an affirmative defense, pursuant to a Rule 12(b)(6) motion. Dean v. Pilgrim's Pride Corp., 395 F.3d 471, 474 (4th Cir. 2005). But "the time bar [must be] apparent on the face of the complaint." Id.

As an initial matter, because this case is before the Court on diversity jurisdiction, the Court must look to North Carolina's conflict of laws rules to determine which state's laws apply to the claims. See Klaxon Co. v. Stentor Elect. Mfg. Co., Inc., 313 U.S. 487, 496 (1941), superseded by statute on other grounds (holding that a federal court with diversity jurisdiction must apply the conflict of law rules of the forum state). Both parties rely on North Carolina law throughout their briefs, and Plaintiffs even state that "[b]ased on the filings in this case, there does not seem to be a dispute between the parties that North Carolina law is the proper substantive law to be applied in this case". (See generally Mem. in Supp. of Defs.' Mot. to Dismiss ("Br. in Supp.") [Doc. #14]; Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss Pls.' Compl. ("Br. in Opp'n") [Doc. #16]; see Br. in Opp'n at 3.) Yet, no party analyzes the propriety of their presumed application of North Carolina law.

6

North Carolina's "traditional conflict of laws rule is that matters affecting . . . remedial or procedural rights [such as statutes of limitations] are determined by lex fori, the law of the forum", Boudreau v. Baughman, 368 S.E.2d 849, 853-54, 857 (N.C. 1988), in this case North Carolina.  "[M]atters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim". Id. at 853-54.  Because most of Plaintiffs' claims are barred by statutes of limitations, analysis of the "situs of the claim" is addressed where relevant.

III.

Plaintiffs allege that "[b]ut for Defendant's [sic] intentional deceit, Plaintiff [sic] would not have billed Medicare erroneously and recompensate [sic] $696,411.16 to the federal government"[2]; thus, "Defendant [sic] is liable to Plaintiffs for implied-in-law indemnification." (Compl. ¶¶ 43, 44.)  Defendants argue that this claim is barred by a three-year statute of limitations and that Plaintiffs have not otherwise sufficiently alleged facts to support the claim. (Br. in Supp. at 5-6.)  Plaintiffs do not appear to dispute that a three-year statute of limitations applies, but they argue that their claim is timely and their allegations are sufficient. (Br. in Opp'n at 3-4.)

---

[2] This allegation involving Medicare and the federal government is confusing.  The basis of the Complaint is that the Indiana Attorney General's Medicaid Fraud Unit alleged overpayment from the Indiana Medicaid program.  The State initially "sought $696,411.16 in repayment" but Dr. Kazi entered into a settlement agreement with the State according to which he agreed to pay the State $424,874.64. (Emphasis added.)

7

North Carolina courts consider a claim for indemnity implied-in-law as an "equitable concept[] arising from the tort theory of indemnity" and, thus, "indemnity implied-in-law arises from an underlying tort". <u>Kaleel Builders, Inc. v. Ashby</u>, 587 S.E.2d 470, 474 (N.C. Ct. App. 2003).  Therefore, it is appropriate to apply North Carolina's statute of limitations for torts which is three years, N.C. Gen. Stat. § 1-52(16).  Defendants argue the claim accrued on the date of Dr. Kazi's purchase of the BioLis 24i or the date he received it, (Br. in Supp. at 5), while Plaintiffs argue that the claim accrued when damages became apparent or ought reasonably to have become apparent to them, (Br. in Opp'n at 4).

But, under North Carolina law, "[t]he right to sue for indemnity for damages resulting from the negligence, misfeasance or malfeasance of another does not accrue until legal payment has been made." <u>Hager v. Brewer Equip. Co.</u>, 195 S.E.2d 54, 56 (N.C. Ct. App. 1973) (explaining that "while Brewer may have had a right to sue at [the time it purchased the elevator] for damages it incurred as a result of the negligence and breach of warranty, it obviously had no right to sue at that time to recover for damages it may be forced to pay a third party as a result of [another's] primary liability").  According to the Settlement Agreement between the State of Indiana and Dr. Kazi, he agreed in September 2018[3] to pay

---

[3] He executed the agreement on September 14.  The State executed it on September 27.  Dr. Kazi alleges that he entered into the settlement on September 27. (Compl. ¶ 33.)

8

$424,874.64 "over three (3) years in monthly installments of $11,802.07 per month".  He filed the instant Complaint on June 30, 2021; thus, the claim is timely.

To determine which state's substantive law applies to this claim, the "court must look first and foremost to the law" of the North Carolina Supreme Court, and, if it has not spoken on the issue, the court may look to the state's Court of Appeals for guidance. Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998).  For torts, North Carolina applies the law of the state where the injury occurred. Boudreau, 368 S.E.2d at 854.  Because North Carolina assesses indemnity implied-in-law in the tort context, that same rule is applied here. See, e.g., N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs., Inc., 386 F. Supp. 2d 648, 658 (M.D.N.C. 2005) (applying North Carolina's choice of law rules for torts to determine which state's law applies to a claim for indemnification by analyzing where the injury occurred).

"The plaintiff's injury is considered to be sustained in the state 'where the last act occurred giving rise to [the] injury.'" Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 724 (N.C. Ct. App. 2010) (quoting United Va. Bank v. Air-Lift Assocs., Inc., 339 S.E.2d 90, 94 (N.C. Ct. App. 1986)).  "When a plaintiff suffers 'commercial or financial injury rather than physical injury, courts often look at the location where the economic loss was felt.'" P & L Development, LLC v. Bionpharma, Inc., 367 F. Supp. 3d 421, 429 (M.D.N.C. 2019) (quoting Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sept. 21, 2005)).  A plaintiff may feel the economic loss in the state of its

9

principal place of business, but there is no bright line rule to that effect. Id.

(quoting United Dominion Indus., Inc. v. Overhead Door Corp., 762 F. Supp. 126,

130 (W.D.N.C. 1991); Harco Nat'l Ins. Co., 698 S.E.2d at 725-26).

Here, it is apparent that Plaintiffs felt the economic loss and thus were

injured in Indiana. Dr. Kazi resides and practices medicine there at the Indiana

Pain and Spine Clinic, and he agreed to pay the State $424,874.64. Thus, Indiana

law applies to this claim. As an initial matter, it is not clear that Indiana

recognizes a claim for indemnification implied-in-law under these circumstances –

where Dr. Kazi was alleged to have violated Indiana Code § 5-11-5.5-1 et seq.

(false statements/fraudulent actions against the state) and § 5-11-5.7-1 et seq.

(Medicaid false claims) when he submitted reimbursement claims for quantitative

tests.

In any event, Plaintiffs have not sufficiently alleged facts to state a claim

under Indiana law for indemnity implied-in-law. "Generally, implied indemnity is

created by a relationship between the parties, i.e. employer-employee, principal-

agent." Sears, Roebuck & Co., Inc. v. Boyd, 562 N.E.2d 458, 461 (Ind. Ct. App.

1990). "The right to indemnity may be implied at common law only in favor of

one whose liability to a third person is solely derivative or constructive, and only

as against one who has by his wrongful act caused such derivative or constructive

liability to be imposed upon the indemnitee." Indianapolis Power & Light Co. v.

Brad Snodgrass, Inc., 578 N.E.2d 669, 671 (Ind. 1991). "[D]erivative liability arises

pursuant to either an employer/employee relationship (respondeat superior) or a

manufacturer/seller relationship." Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, PC, 929 N.E.2d 838, 849 n.10 (Ind. Ct. App. 2010). "Constructive liability arises when a statute or rule of law imposes a nondelegable duty on a party, rendering him liable when he is otherwise without fault." Id. In addition, "[a]bsent an adequate express contract, a party seeking indemnification from another must be free of fault." Indianapolis Power & Light Co., 578 N.E.2d at 671-72 (explaining that the injured party's "complaint seeks to impose liability only for the direct negligence of IPL and/or House and not for any claim of imputed negligence from the conduct of Snodgrass"; "[t]herefore, any judgment against IPL or House would necessarily constitute a determination that they were not free from fault and thus not entitled to implied indemnity from Snodgrass under existing common law").

It is evident from the allegations that Dr. Kazi's liability to the State of Indiana was neither solely derivative of CLC's liability nor solely constructive; he was directly liable to the State for claims that he submitted as a medical provider. Nor was he free from fault. Although Dr. Kazi's settlement with Indiana was not an admission of liability, it was a compromise according to which he agreed to take certain actions, including to pay the State significant restitution and penalties, because of the liability that resulted from claims that he submitted with improper reimbursement codes and for quantitative tests that were apparently not quantitative tests at all. Therefore, Plaintiffs have not sufficiently alleged a claim for implied-in-law indemnification under Indiana law, and Claim I is dismissed.

11

IV.

Plaintiffs also allege that CLC committed fraud when it "purposefully mislead [sic] Plaintiffs in marketing the BioLis 24i as being able to conduct multi-assay urinalyses testing when, in reality, the Model can only conduct single assay urinalysis testing." (Compl. ¶ 47.) Defendants argue that the three-year statute of limitations bars the claim and that the allegations otherwise fail to state a claim. (Br. in Supp. at 7-10.) The Plaintiffs disagree, and, as for the statute of limitations, they contend it should be a question for the jury. (Br. in Opp'n at 4-7.)

The statute of limitations in North Carolina for a claim of fraud is three years, but it does not accrue "until the discovery by the aggrieved party of the facts constituting the fraud . . . ." N.C. Gen. Stat. § 1-52(9). "For purposes of [§ 1-52(9)], 'discovery' means either actual discovery or when the fraud should have been discovered in the exercise of 'reasonable diligence under the circumstances.'" Forbis v. Neal, 649 S.E.2d 382, 386 (N.C. 2007) (quoting Bennett v. Anson Bank & Trust Co., 143 S.E.2d 312, 317 (N.C. 1965)). "[W]here a person is aware of facts and circumstances which, in the exercise of due care, would enable him or her to learn of or discover the fraud, the fraud is discovered for purposes of the statute of limitations." Newton v. Barth, 788 S.E.2d 653, 662 (N.C. Ct. App. 2016) (quoting Jennings v. Lindsey, 318 S.E.2d 318, 321 (N.C. Ct. App. 1984)). As the North Carolina Supreme Court stated nearly a century ago, "A man should not be allowed to close his eyes to facts observable by ordinary attention and maintain for his own advantage the position of ignorance. Such a principle would

12

enable a careless man, and by reason of his carelessness, to extend his right to recover for an indefinite length of time, and thus defeat the very purpose the statute was designed and framed to accomplish." Moore v. Fidelity & Cas. Co. of N.Y., 177 S.E. 406, 408 (1934).

"Ordinarily, a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances." Forbis, 649 S.E.2d at 386. However, when it is clear from the face of the complaint "that the claimant had both the capacity and opportunity to discover the [fraud] but failed to do so the absence of reasonable diligence is established as a matter of law." Grubb Props., Inc. v. Simms Inv. Co., 400 S.E.2d 85, 88 (N.C. Ct. App. 1991) (affirming summary judgment on the statute of limitations bar); see also Jackson v. Minn. Life Ins. Co., 275 F. Supp. 3d 712, 722 (E.D.N.C. 2017) (acknowledging that "[w]hen fraud should have been discovered in the exercise of reasonable diligence is ordinarily a question for the jury" but it can be determined in a Rule 12(c) motion); Mountain Land Props., Inc. v. Lovell, 46 F. Supp. 3d 609, 624 (W.D.N.C. 2014) (recognizing that the exercise of reasonable diligence can be determined in a Rule 12(b)(6) motion if "it is clear [from the factual allegations] that there was both capacity and opportunity" to discover the fraud); Forshaw Indus., Inc. v. Insurco, Ltd., 2 F. Supp. 3d 772, 783 (W.D.N.C. 2014) (finding that "the complaint contains sufficient facts on its face to establish that the statute of limitations had run for" fraud); Wilson v. Crab Orchard Dev. Co., 171 S.E.2d 873, 884 (N.C. 1970) (determining on a motion for judgment on the pleadings that even if the plaintiff

13

did not have actual knowledge of fraud at a given time, "reasonable diligence would have thus disclosed [those facts] to her").

Defendants contend that, to the extent this claim is based on false advertising, the latest advertisement was a 2013 brochure. (Br. in Supp. at 7.) In addition, though, they argue that the October 2017 notice from the State of Indiana "provided Dr. Kazi unequivocal knowledge of a potential fraud allegation against the defendants". (Id. at 9.) Plaintiffs respond that Dr. Kazi did not become aware of the results of the State's investigation in October 2017 and that "nothing on the face of [their] Complaint" alleges "that Dr. Kazi was aware of the fraudulent acts of Defendants or knew the facts contained in the investigation of the Indiana Attorney General on the date notice was received". (Br. in Opp'n at 6-7.) Plaintiffs read the discovery rule too narrowly.

Plaintiffs allege that Dr. Kazi purchased the BioLis 24i because it could perform in-office tests that identify which drugs are present in the urine sample which not only allows Dr. Kazi to "know whether his patients are using substances, but [also] to understand the identity of [those] substances, so he can better help his patients with recovery." They also allege that the BioLis 24i could not perform those tests. It is implausible that Dr. Kazi would not have realized – with each test he performed – that the results did not identify which substances were detected, something he planned to be able to use to "better help his patients with recovery." Nothing in the Complaint suggests that Dr. Kazi did not have the

14

capacity and opportunity to discover the facts constituting fraud each time he performed these tests and reviewed their results.

Nevertheless, at the latest, Dr. Kazi discovered the alleged fraud on October 24, 2017 when he received the notice from the Indiana Attorney General, Medicaid Fraud Unit. The notice alleged that Dr. Kazi "upcod[ed] UDT tests by charging for quantitative tests when the UDT equipment was not capable of performing such tests" and was overpaid for "inappropriate billing codes" and "for fee for service traditional Medicaid claims for quantitative, confirmation testing done with a 'UDS immunoassay machine manufactured by Carolina Liquid Laboratories in 2015'" that "'cannot perform and was never approved by the FDA to perform quantitative, confirmation testing." The only plausible inference from the factual allegations is that Dr. Kazi was aware of circumstances and facts that enabled him to discover the fraud, and that he had the capacity and opportunity to do so, once he received the October 24, 2017 notice. As the North Carolina Supreme Court said so long ago, Dr. Kazi cannot "close his eyes to facts observable by ordinary attention." It is apparent from the face of the Complaint that the three-year statute of limitations began to run on October 24, 2017 at the latest and expired before Plaintiffs filed their Complaint on June 30, 2021. Claim II is dismissed.

V.

Plaintiffs also allege claims for breach of implied warranty of merchantability and fitness for a particular purpose. Defendants argue that both claims are barred by the four-year statute of limitations and are precluded by the

15

terms of the sales agreement. (Br. in Supp. at 10-14.)  Plaintiffs did not respond and, thus, have conceded the issue. <u>See, e.g.</u>, R. of Practice & P. of U.S. Dist. Ct. for the M.D.N.C. 7.3(k) ("The failure to file a . . . response within the time specified in this rule shall constitute a waiver of the right thereafter to file such a . . . response, except upon a showing of excusable neglect. . . . If a respondent fails to file a response within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice."); <u>Hadley v. City of Mebane</u>, No. 1:18CV366, 2020 WL 1539724, at *6 (M.D.N.C. Mar. 31, 2020) (citing cases construing Local Rules and failures to respond).  Nevertheless, the court must review Defendants' challenge "to ensure that dismissal is proper." <u>Stevenson v. City of Seat Pleasant</u>, 743 F.3d 411, 416 n.3 (4th Cir. 2014).

Indeed, both claims are barred by the four-year statute of limitations. <u>See</u> N.C. Gen. Stat. § 25-2-725(1).  They accrued upon the occurrence of the alleged breach, no matter Plaintiffs' lack of knowledge of the breach. N.C. Gen. Stat. § 25-2-725(2).  Except for a circumstance not relevant here, a "breach of warranty occurs when tender of delivery is made". <u>Id.</u>  Based on the allegations in the Complaint, four years from the delivery of the BioLis 24i to Dr. Kazi had long since passed by the time the instant action was filed on June 30, 2021. (<u>See</u> Compl ¶ 28 (alleging the purchase of the BioLis 24i on January 9, 2014), ¶ 26 (alleging that Dr. Kazi was placed in contact with a billing consultant in March 2014 who directed him on billing procedure for the tests), ¶ 29 (alleging that the Indiana Attorney

General concluded that Dr. Kazi had overbilled $338,460.83 between January 1, 2014 and December 31, 2016).)  Therefore, Claims III and IV are appropriately dismissed.

VI.

Finally, Plaintiffs allege that Defendants committed unfair and deceptive trade practices.  Defendants contend that the claim is barred by the statute of limitations and, alternatively, that there is no allegation that Dr. Kazi received or relied on any advertisements and that the allegations of fraud are not particularly pled. (Br. in Supp. at 14-16.)  Plaintiffs respond that the statute of limitations does not bar the claim and Defendants' deception is not limited to the advertisements. (Br. in Opp'n at 7-11.)

There appears to be no dispute that a four-year statute of limitations applies to this claim, N.C. Gen. Stat. § 75-16.2.  The disagreement is the accrual of the claim.  "[W]hen, as in this case, a UDTPA claim is based on alleged fraudulent conduct, then the violation occurs – and the limitations clock starts running – 'at the time that the fraud is discovered or should have been discovered with the exercise of reasonable diligence.'" Dreamstreet Invs., Inc. v. MidCounty Bank, 842 F.3d 825, 830 (4th Cir. 2016) (quoting Rothmans Tobacco Co., Ltd. v. Liggett Group, Inc., 770 F.2d 1246, 1249 (4th Cir. 1985) (citing Wilson v. Crab Orchard Dev. Co., 171 S.E.2d 873, 884 (N.C. 1970))).  As explained above, at the latest, Plaintiffs' fraud claim accrued on October 24, 2017 when Dr. Kazi received the notice from the Indiana Attorney General.  Thus, this UDTPA claim is timely.

17

Next, it must be determined which state's law applies to the claim. North Carolina's Supreme Court has not addressed the state's choice of law rule for an unfair and deceptive trade practices claim. And two panels of the North Carolina Court of Appeals issued opinions applying different choice of law tests to the claim. See Stetser v. TAP Pharm. Prods., Inc., 598 S.E.2d 570, 580 (N.C. Ct. App. 2004) (recognizing a "split of authority"); compare United Va. Bank v. Air-Life Assocs., Inc., 339 S.E.2d 90, 93-94 (N.C. Ct. App. 1986) (applying the lex loci rule) with Andrew Jackson Sales v. Bi-Lo Stores, Inc., 314 S.E.2d 797, 799 (N.C. Ct. App. 1984) (applying the most significant relationship test). Federal courts in North Carolina have since anticipated that the North Carolina Supreme Court would apply the lex loci test to claims of unfair and deceptive trade practices. P & L Dev., LLC, 367 F. Supp. 3d at 428 (citing cases and applying the lex loci test). Cf. SmithKline Beecham Corp. v. Abbott Labs, No. 1:15CV360, 2017 WL 1051123, at *7-*8 (M.D.N.C. Mar. 20, 2017) (recognizing Edmonson v. Am. Motorcycle Ass'n, Inc., 7 F. App'x 136, 150 (4th Cir. Feb. 2, 2001), and applying "the lex loci test unless its application does not yield a clear answer and the place of injury is so open to debate that application of the significant relationship test is more appropriate"). As explained above, (supra at 9-10), the state where Plaintiffs suffered injury – felt the economic loss – is the state whose law applies. As previously determined, (supra at 10), the Complaint makes it clear that Plaintiffs suffered their injury in Indiana.

18

Indiana's Deceptive Consumer Sales Act ("IDCSA") prohibits a supplier from committing "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a). Subject to an exception not relevant here, a "consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things." Ind. Code § 24-5-0.5-2(1). A "person" is "an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity." Ind. Code § 24-5-0.5-2(2). A "supplier" is one "who regularly engages in or solicits consumer transactions . . . [and] includes a manufacturer, wholesaler, or retailer . . . ." Ind. Code § 24-5-0.5-2(3)(A). Plaintiffs are clearly "person[s]" under the statute. Thus, the issue is whether the sale of the BioLis 24i is a consumer transaction. The answer lies in whether Plaintiffs purchased the device for primarily personal purposes.

In IUE-CWA Local 901 v. Spark Energy, LLC, 440 F. Supp. 3d 969, 972 (N.D. Ind. 2020), the plaintiff alleged the defendant, an alternative natural gas supplier, violated the IDCSA when it "'engaged in a classic bait-and-switch deceptive and unfair marketing scheme aimed at those hoping to save on the cost of natural gas' when it promised competitive variable rates based on market prices" but "[i]n actuality, [its] prices were much higher than the rates otherwise available in the

19

natural gas market." The defendant contended that the IDCSA did not apply because the plaintiff's purchase of natural gas was not a consumer transaction. Id. at 975. In response, the court explained that "Indiana statutes must be construed by using the plain and ordinary meanings of terms, unless doing so would result in a construction that 'is plainly repugnant to the intent of the legislature or of the context of the statute.'" Id. at 975-76 (quoting Ind. Code § 1-1-4-1(1)). The court determined that because a corporation is a "person" under the statute, "it can make purchases of items and services that are primarily for that corporation's personal use." Id. at 976. "Here, the clear implication of the Complaint is that the purchase of natural gas was for that corporation's personal use. Plaintiff did not sell the natural gas to other consumers. Rather, it was using the natural gas as a source of energy like any other consumer would." Id.

By comparison, the plaintiffs in McLeskey v. Morris Invest, No. 1:18-cv-02797-JPH-TAB, 2020 WL 3315996, at *1 (S.D. Ind. June 18, 2020), sued the defendants for violating the IDCSA after the defendants made certain alleged misrepresentations to the plaintiffs about rental property that the plaintiffs purchased hoping "their investment would generate passive income through monthly rental checks." In defense, the defendants argued that the sale of the rental property was not a consumer transaction. Id. at *6. According to the court, "[t]ypically, an individual who acts with a commercial motive is not a consumer." Id. (quoting Black's Law Dictionary for the definition of consumer). Because the plaintiffs alleged that they bought the property because "they wanted 'to invest in

20

"turnkey" rental properties generating immediate income,'" that transaction was primarily a commercial one and, thus, not covered by the IDCSA. Id. See also, e.g., Galveston, LLC v. Morris Invest, LLC, No. 1:19-cv-02676-SEB-TAB, 2020 WL 5798160, at *7 (S.D. Ind. Sept. 29, 2020) (finding the same); In re Syngenta AG MIR 162 Corn Litigation, MDL No. 2591, 14-md-2591-JWL, 2017 WL 2080601, at *10-*11 (D. Kan. May 15, 2017) (finding that the plaintiff-corn-farmer's purchase of seeds from the defendant was not a consumer transaction under the IDCSA because the plaintiff purchased the seeds to resell them, which was a commercial, not a personal or agricultural purpose).

Here, Plaintiffs allege that a CLC salesperson visited Dr. Kazi "and laid out the template of the revenue Dr. Kazi could generate if he purchased and used a CLC urinalysis device." (Compl. ¶ 15.) The salesperson who sold the BioLis 24i to Dr. Kazi told him "that the system purchased was capable of performing quantitative testing that could be charged to Medicare and Medicaid at a much higher rate than a qualitative UDT system. For example, a qualitative in office test is usually reimbursed at about $20 per test but a quantitative in office test can be reimbursed at about $467 per test." (Id. ¶¶ 17-18.) Dr. Kazi alleges that he "was repeatedly informed by . . . CLC that the Biolis 24i was capable of quantitative tests or multi-assay urinalyses and that Medicare and Medicaid would reimburse at the higher rate." (Id. ¶ 19.) And these quantitative tests would allow Dr. Kazi to "better help his patients with recovery" because they would identify amounts of various substances, not just their presence. (Id. ¶ 20; see, e.g., Compl. Ex. 3.) In

21

sum, as alleged, the primary purpose of Dr. Kazi's purchase of the BioLis 24i was commercial, not personal. He bought the device because of its ability to conduct quantitative tests, used it as part of his medical practice, and billed for the tests which generated significant income. This is not a transaction akin to that in IUE-CWA Local 901 where the union purchased natural gas to consume just like any consumer would. Because Plaintiffs have not alleged a consumer transaction as that term is defined in the IDCSA, they have not stated a claim. Thus, Claim V is dismissed.[4]

## VII.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss [Doc. #13] is GRANTED. A judgment dismissing this action will be entered contemporaneously.

This the 25th day of March, 2022.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

---

[4] Because all claims are dismissed, it is unnecessary to address Defendants' remaining challenge: that the Complaint fails to identify any specific actions by Phil or Patricia Shugart, (Br. in Supp. at 16-17).

22